UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES, )<br>)<br>v. )<br>)<br>SCOTT FLEURANTIN, )<br>    Defendant )<br>) | Docket No. 22-CR-10267-DJC |

**DEFENDANT FLEURANTIN'S SENTENCING MEMORANDUM**

The Defendant submits this memorandum in support of his request for a sentence of 72 months imprisonment, which is "sufficient, but not greater than necessary" to comply with 18 U.S.C. § 3553(a)(2).

**Procedural History**

On June 25, 2021, Scott Fleurantin was arrested and detained in state custody on this matter. On May 3, 2022, he appeared in federal court and has been detained in federal custody since that time. On January 26, 2023, Mr. Fleurantin pled guilty to one count of Possession with Intent to Distribute Fentanyl, in violation of 21 U. S. C. § 841(a)(1). There is a binding plea agreement in this case in which the government agrees to not charge the defendant pursuant to 18 U.S.C. § 922(g)(1) and 942(c). The parties have agreed to a sentence between 72 months and 132 months of imprisonment and 36 months of supervised release.

**Guideline Sentencing Range**

The Defendant's Guideline range depends on whether he is a Career Offender. Without this enhancement, his Total Offense Level would be 19, with a

1

CHC of VI and a GSR of 63-78 months. If he is a Career Offender, his Total Offense Level is 29 and his GSR is 151-188 months.

## The Defendant's History and Characteristics

The defendant was born and raised in a stable household in Cambridge, Massachusetts. Although the family struggled economically and often lived in public housing, his parents were always able to provide basic necessities. See PSR at ¶¶53-62.

The stability he had as a young child was soon disrupted. When Mr. Fleurantin was fifteen, his brother was shot twice in the head. Unfortunately, this trauma caused him to make bad choices in his life, mainly out of fear. Instead of playing sports, he began associating with people that he thought could protect him. He has, to date, seemingly been unable to extricate himself from this downward spiral. See PSR at ¶¶53-62.

Nevertheless, despite his many bad decisions, he retains strong family support. His mother is a retired nurse, and his father is a retired bus driver. He has a great relationship with his parents, who now live in Woburn. His mother has indicated that he is welcome to return to the family home and that both parents remain supportive. He is likewise close with his sister, Akiana, who is a social worker. He also has two adult children, Sidayaah and Neyesha, that he speaks to regularly and who remain supportive. Tragically his half-brother, Ricardo, with whom he was also close, passed away this April from a drug overdose. See PSR at ¶¶53-62.

Moreover, unlike many defendants who come before the court, Mr. Fleurantin has no history of mental illness and a very limited history of substance abuse. See PSR at ¶¶71-74. He also has a high school diploma and has completed most of the credits necessary for an associate's degree. See PSR at ¶¶75-76. During a previous incarceration, he obtained an HVAC license and Forklift Operation certificate, though both are likely expired. See PSR at ¶78. Finally, while in federal custody, he has completed courses in Anger Management, Stress Management, and Adjustment to Incarceration. See Certificates, attached.

Mr. Fleurantin also maintains significant community support. In addition to letters from his younger sister and his girlfriend, attached to this memo are character references from a childhood friend, Jeremiah Younossi, and a mentor, Halima Tanous. See Support Letters, attached.

His sister Akiana describes Mr. Fleurantin as "my protector, my supporter, and most importantly, my friend" and relays how his various incarcerations have "broken" her and their family. See Letter of Akiana Fleurantin. His girlfriend Tenisha describes him as "a good, kindhearted caring soul that would do just about anything for anyone…[and] a great father to his daughter and a loving son." See Letter of Tenisha Raspberry.

His childhood friend Jeremiah notes how Mr. Fleurantin "got hooked up with the wrong crowd, and became pressured and brainwashed into a reality that was not consistent with how he was raised…" See Letter of Jeremiah Younossi. He describes "his true character, and who he really is….[as] a brilliant guy..[with] an

3

incredible sense of humor like Eddie Murphy, and is a wiz on music and sports statistics like an ESPN analyst." *Id*. He further relates that "[i] n our 20s, Scott often would call me and give me funny jokes that I would borrow or share with Eminem and 50 Cent, and they would actually add them to their rap lyrics. I kid you not! That's how funny Scotty was!" *Id*.

Finally, his mentor, Halima Tanous, describes Mr. Fleurantin as a "very intelligent and motivated individual" and she has "no doubt that Scotty has the brains and skills to succeed at anything he attempts." See Letter of Halima Tanous. She has offered to "personally help" Mr. Fleurantin maintain proper direction and to help him find the "programs and services that will benefit him." *Id*. She also "recognize[s] that Scotty has a very different set of needs as he will need to have a successful transition" and has provided the Court with a list of potential resources that she will help him engage with upon his release.

## Argument

### I. A Sentence of 72 Months is Sufficient, but not Greater than Necessary to comply with the mandates of § 3553.

Based on a Guideline range of 63-78 months, a sentence of 72 months imprisonment is "sufficient, but not greater than necessary" to comply with 18 U.S.C. §3553(a)(2).

### A. Mr. Fleurantin is not a Career Offender

Mr. Fleurantin has objected to Probation's determination that he is a Career Offender, pursuant to USSG §4B1.1, based on five prior drug convictions. See PSR

4

at ¶¶33, 35-38. Without this enhancement, his Offense Level would be 19, with a CHC of VI and a GSR of 63-78 months.

Mr. Fleurantin is not a Career Offender because none of his prior cocaine convictions count as a "controlled substance offense." That term is defined in § 4B1.2(b) and Application Note 1 of the Commentary to § 4B1.2" as follows:

> an offense under federal or state law, punishable by imprisonment for a term exceeding one year, that prohibits the manufacture, import, export, distribution, or dispensing of a controlled substance ... or the possession of a controlled substance ... with intent to manufacture, import, export, distribute, or dispense.

U.S.S.G. § 4B1.2(b). The government bears the burden of demonstrating that a prior conviction properly qualifies as a predicate offense. *United States v. Dávila–Félix*, 667 F.3d 47, 55 (1st Cir. 2011); *United States v. Mohamed*, 920 F.3d 94, 99 (1st Cir. 2019).

To determine whether a state offense is a "controlled substance offense," this Court must apply the categorical approach. *See Moncrieffe v. Holder*, 569 U.S. 184 (2013); *United States v. Abdulaziz*, 998 F.3d 519, 522 (1st Cir. 2021) (same). A state offense is a categorical match with a Guideline offense only if the conviction "necessarily involved facts equating to the generic federal offense." *Shepard v. United States*, 544 U.S. 13, 24 (2005). Further, courts "must presume that the conviction 'rested upon nothing more than the least of the acts' criminalized, and then determine whether even those acts are encompassed by the generic federal offense.'" *Moncrieffe*, 569 U.S. at 190; *Abdulaziz*, 998 F.3d at 522.

5

To determine what the "generic federal offense" is for the purposes of this particular Guideline provision, this Court must compare the definition of cocaine within the federal Controlled Substance Act, 21 U.S.C. § 812, to the elements of the state conviction. This is because the Guidelines eschew state law labels and instead "presume the application of federal standards unless [the Guidelines] explicitly provide otherwise." *United States v. Townsend*, 897 F.3d 66, 70–71 (2d Cir. 2018); *United States v. Mulkern*, 854 F.3d 87, 96 (1st Cir. 2017) (rejecting state law labels for drug crimes); *see also Taylor v. United States*, 495 U.S. 575, 579 (1990) (rejecting argument that "burglary" in Armed Career Criminal Act means "burglary" however a state chooses to define it); *Esquivel-Quintana v. Sessions*, 137 S.Ct. 1562, 1570 (2017) (rejecting argument that "sexual abuse of a minor" encompasses all state statutory rape convictions regardless of the state's age of consent, because that definition "turns the categorical approach on its head by defining the generic federal offense of sexual abuse of a minor as whatever is illegal under the particular law of the State where the defendant was convicted"); *see also United States v. Mohamed*, 920 F.3d at 106 (comparing Maine drug laws to federal prosecutions under the CSA to determine if the defendant's Maine conviction is a "controlled substance offense"); *Id.* at 107 (Barron, J., dissenting) (noting the Government's argument that "the Guidelines' definition of a 'controlled substance offense' necessarily encompasses conduct that suffices to satisfy the distributive intent element of that federal drug crime.").

6

In addition to the First Circuit, various other courts have held that the federal law definition of a "controlled substance" within the CSA is what the sentencing judge must compare to the state law offense of conviction. *See Townsend*, 897 F.3d at 70; *United States v. Sanchez-Garcia*, 642 F.3d 658, 662-63 (8th Cir. 2011) ("California law defines 'controlled substance' differently than the federal CSA. A California defendant may be convicted of possession for sale of a controlled substance without committing a 'controlled substance offense'…under the federal guidelines") (internal citations omitted); *United States v. Leal-Vega*, 680 F.3d 1160, 1167 (9th Cir. 2012) ("we hold that the term 'controlled substance,' as used in the 'drug trafficking offense' definition in U.S.S.G. § 2L1.2, means those substances listed in the [federal] CSA"); *United States v. Gomez-Alvarez*, 781 F.3d 787, 793–94 (5th Cir. 2015) ("For a prior conviction to qualify as a 'drug trafficking offense,' the government must establish that the substance underlying that conviction is covered by the [federal] CSA").

**1. The Massachusetts convictions do not count as predicates.**

The Defendant's 2006 cocaine conviction, and his three 2019 cocaine convictions (PSR at ¶¶33, 35, 36, 38) do not qualify as predicate "controlled substance offense" per USSG § 4B1.2(b) because the Massachusetts definition of cocaine is broader than the current federal definition. Specifically, Massachusetts law criminalizes the distribution of a derivative of cocaine that federal law does not.

The First Circuit's analysis in *Abdulaziz,* 998 F.3d at 519, makes clear that the first step in determining whether a state court conviction for a drug offense

7

qualifies as a predicate for enhancing a sentence under the federal sentencing guidelines is to look at the definition of the controlled substance at issue, in this case cocaine. As part of its cocaine definition, Massachusetts law criminalizes ioflupane, which is a derivative of ecgonine. Mass. Gen. Law. c. 94C § 31. Section 31 states, in pertinent part:

> CLASS B
> (a) Unless specifically excepted or unless listed in another schedule, any of the following substances whether produced directly or indirectly by extraction from substances of vegetable origin, or independently by means of chemical synthesis, or by a combination of extraction and chemical
> synthesis: . . .
> (4) Coca leaves and **any** salt, compound, **derivative**, or preparation of coca leaves, and any salt, compound, derivative, or preparation thereof which is chemically equivalent or identical with any of these substances, except that the substances shall not include decocainized coca leaves or extraction of coca leaves, which extractions do not contain cocaine or ecgonine.

M.G.L. c. 94C § 31 (emphasis added).

Schedule II of the CSA previously included I123 ioflupane. "Ioflupane was, by definition, a Schedule II controlled substance because it is derived from cocaine via ecgonine, both of which are schedule II controlled substances." Schedules of Controlled Substances: Removal of [123 I] Ioflupane from Schedule II of the Controlled Substances Act, 80 Fed. Reg. 54,715, 54,715 (Sept. 11, 2015); s*ee id*. at 54,716 (same). It was subsequently removed from Schedule II in September 2015. Since that time, it has not been included on any federal drug schedule. *See* 21 C.F.R. §1308.12(b)(4)(ii)(July 12, 2021)(except[ing] I123 ioflupane from current Schedule II):

8

> Coca leaves (9040) and any salt, compound, derivative or preparation of coca leaves (including cocaine (9041) and ecgonine (9180) and their salts, isomers, derivatives and salts of isomers and derivatives, and any salt, compound, derivative or preparation thereof which is chemically equivalent or identical with any of these substances, *except that such substances shall not include*:
>> (1) Decocainized coca leaves or extraction of coca leaves, which extractions do not include cocaine or ecgonine; or (2) [123 I] ioflupane;

21 C.F.R. 1208.12 (July 12, 2021) (emphasis added). In short, I123 ioflupane is not a "controlled substance" as defined in 21 U.S.C. § 802.

Since the Massachusetts definition of cocaine is broader than the federal definition at the time of this sentencing, because it controls ioflupane I123, and federal law does not, Mr. Fleurantin' 2006 and his three 2019 Massachusetts cocaine convictions categorically fail to qualify as a "controlled substance offense" under the federal sentencing guidelines.

One judge of this Court has found that a 2008 Massachusetts conviction for cocaine distribution did not qualify as a predicate offense for a career offender enhancement. See *United States v. Jiminez*, 4:21-cr-40022-TSH. Similarly, another judge of this Court found that convictions for Massachusetts cocaine offenses did not qualify as predicate offenses for the Armed Career Criminal Act enhancement. *United States v. Rise*, 17-cr-10146-MLW (ECF # 141).

Other courts have found a state drug statute to be overbroad because it did not except Ioflupane from its definition. A judge in the Southern District of Maryland found that a defendant's 1995 Maryland conviction under Md. Code, Art. 27 § 279(b)(4) was overbroad because it necessarily criminalized ioflupane as a

derivative of ecgonine. *See* Transcript of Sentencing Proceedings, *United States v. Demetrius Keaton,* No. TDC-18-215 at 24-30 (D. Md. June 1, 2022) (ECF 146). In that case the government did not dispute the defendant's expert's opinion that ioflupane would be criminalized under the Maryland statute but not under the Federal Controlled Substances Act. Similarly in *United States v. Holliday*, 853 F.App'x 53 (9th Cir. 2021) the Ninth Circuit held that a Montana statute was categorically overbroad because it criminalized cocaine derivatives while the federal statutory drug schedules did not, and also overbroad because the federal regulatory drug schedules were amended to exclude "ioflupane" from the list of cocaine-related substances, while the state statutes were not.

Because I123 ioflupane is not a Schedule II controlled substance, and because this Court must use the categorical approach to determine whether Mr. Fleurantin's Massachusetts convictions were for a federally controlled substance, this Court should conclude that the four Massachusetts convictions are not valid predicate offenses.

**2. The Florida conviction does not count as a predicate.**

Mr. Fleurantin's 2016 Florida cocaine trafficking conviction likewise does not qualify as a predicate offense because the relevant Florida drug laws are overbroad both as to the nature of the substance and as to prohibited conduct. See PSR at ¶37.

As to the nature of the prohibited substances, at the time of the state conviction, Florida defined cocaine just as Massachusetts does now. See FL ST § 893.03 (effective July 1, 2016 to June 30, 2017) (banning "Cocaine or ecgonine,

10

including any of their stereoisomers, and any salt, compound, derivative, or preparation of cocaine or ecgonine" and not excluding ioflupane from this definition.) So, all the arguments that apply to the Massachusetts drug convictions apply equally to the Florida case.

In addition, Mr. Fleurantin's 2016 Florida case was for trafficking. Florida law says that "Any person who knowingly sells, purchases, manufactures, delivers, or brings into this state" cocaine is guilty of trafficking. FL ST § 893.135(1)(b)(1). However, the act of "[b]ringing into the [state] lacks a connection to manufacturing or distributing, or possessing with the intent to do either, and is more closely related to possession with no intent to manufacture or distribute, which is not [a] predicate. *United States v. Bain*, No. 14-CR-10115-IT, 2022 WL 4494036, at *5 (D. Mass. Jan. 14, 2022).

**B. A Sentence of 72 Months Would Have An "Adequate" Deterrent Effect on the General Public**

A sentence of 72 months would have an "adequate" deterrent effect on the general public. See 18 U.S.C. § 3553. Determining the sentence that would "adequate[ly]" deter criminal conduct is appropriate because research consistently indicates that although the certainty of being caught and punished does have a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006). "Three National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence." Id; see also Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm:*

11

*Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 481, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity."); Steven N. Durlauf & Daniel S. Nagin, *Imprisonment and Crime: Can Both be Reduced?*, 10 Criminology & Pub. Pol'y, 37 (2011)[1] ("The key empirical conclusions of our literature review are that at prevailing levels of certainty and severity, relatively little reliable evidence of variation in the severity of punishment having a substantial deterrent effect is available and that relatively strong evidence indicates that variation in the certainty of punishment has a large deterrent effect, particularly from the vantage point of specific programs that alter the use of police."); Raymond Pasternoster, *How Much Do We Really Know About Criminal Deterrence*, 100 J. Crim. L. & Criminology 765, 818 (2010) (There is "no real evidence of a deterrent effect for severity...[I]n virtually every deterrence study to date, the perceived certainty of punishment was more important than the perceived severity." Id. at 817.)

The findings on general deterrence like those of the Institute of Criminology at Cambridge University are typical. *See* Andrew von Hirsch et al., *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999).[2] The report, commissioned by the British Home Office, examined penalties in the United States as well as several European countries. *Id*. at 1. It examined the effects of changes to both the certainty and severity of punishment. *Id*. While significant

---

[1]Available at http://onlinelibrary.wiley.com/doi/10.1111/j.1745-9133.2010.00680.x/pdf.
[2]Summary available at http://members.lycos.co.uk/lawnet/SENTENCE.PDF.

correlations were found between the certainty of punishment and crime rates, the "correlations between sentence severity and crime rates . . . were not sufficient to achieve statistical significance." *Id.* at 2. The report concluded that, "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences is capable of enhancing deterrent effects." *Id.* at 1.

In this case, a 72-month sentence is sufficient to achieve general deterrence as provided in § 3553. Such a sentence is long enough to send a message to the public that drug dealing will not be tolerated. Increasing Mr. Fleurantin's sentence beyond this will not result in a corresponding increase in general deterrence.

### C. A 72-Month Sentence is Sufficient to Serve as a Specific Deterrent and to Protect the Public

Similar to the argument above involving general deterrence, there is significant research to suggest that while certainty of punishment provides a specific deterrent effect, long prison sentences are not an effective method for combating recidivism. In some circumstances, a longer sentence can have the perverse consequence of *increasing* the likelihood of re-offense, by undercutting the defendant's social connections to family, community, and employers. *See* Valerie Wright, Sentencing Project, *Deterrence in Criminal Justice: Evaluating Certainty vs. Severity of Punishment* 7 (2010) ("…when prison sentences are relatively short, offenders are more likely to maintain their ties to family, employers, and their community, all of which promote successful reentry into society. Conversely, when prisoners serve longer sentences they are more likely to become institutionalized, lose pro-social contacts in the community, and become removed from legitimate

13

opportunities, all of which promote recidivism.")[3]; *see also* Roger Warren, National Center for State Courts, *Evidence-Based Practice to Reduce Recidivism: Implications for State Judiciaries* (2007)("The research evidence is unequivocal that incarceration does not reduce offender recidivism. . . Incarceration actually results in slightly increased rates of offender recidivism.")[4]. A prison sentence longer than 72 months could thus increase the risk of re-offense in Mr. Fleurantin's case by erecting barriers between him and his family and community support.

## Conclusion

Mr. Fleurantin respectfully requests a sentence of 72 months imprisonment, which is "sufficient, but not greater than necessary" to comply with 18 U.S.C. §3553(a)(2).

Respectfully Submitted
Defendant Scott Fleurantin
By his attorney,

/s/ Michael Tumposky
Michael Tumposky (BBO No. 660618)
Hedges & Tumposky, LLP
88 Broad Street, Suite 101
Boston, MA 02110
T) (617) 722-8220
F) (617) 507-8116

---

[3] Available at http://www.sentencingproject.org/ doc/Deterrence%20Briefing%20.pdf.
[4] Available at http://nicic.gov/library/files/023358.pdf.

## CERTIFICATE OF SERVICE

   I, Michael Tumposky, hereby certify that, on this the 15th day of May, 2023, I served one true and correct copy of the foregoing, where unable to do so electronically, by United States First-Class Mail, postage prepaid, to the Assistant United States Attorney of record in this matter.

                                            /s/ Michael Tumposky
                                            Michael Tumposky